UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| IN THE MATTER OF THE SEARCH OF ONE BLACK, SAMSUNG GALAXY NOTE 10+5G CELLULAR PHONE CURRENTLY LOCATED AT 955 GOFFS FALLS RD., MANCHESTER, NH 03103 | Case No. 21-mj-222-01-DL |
|---|---|

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Sean P. Sweeney, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— a wireless/cellular phone—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Task Force Officer ("TFO") with the United States Postal Inspection Service (USPIS). I am currently assigned to the Contraband Interdiction and Investigation ("CI2") Team. I have been a full-time sworn police officer in the State of New Hampshire for approximately 22.5 years. For the last 7.5 years, I have been assigned as an undercover investigator for the Narcotics Investigations Unit (NIU) for the New Hampshire State Police. My primary responsibility in NIU is investigating violations of the New Hampshire Controlled Drug Act and applicable firearms statutes.

3. I have received extensive training in criminal investigations, procedures, and law, and I have assisted senior Postal Inspectors and other law enforcement agents in numerous criminal

investigations and in the execution of search warrants. I have received training from the USPIS in the investigation of controlled substances and proceeds/payments for controlled substances being transported through the United States Mail. I have also received asset forfeiture training and have consulted with senior Postal Inspectors and asset forfeiture specialists.

4. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5. The property to be searched is a black Samsung Galaxy Note10+ cellular phone, serial number SM-N976U (hereinafter the "Device"). The Device is currently located at the United States Postal Inspection Service Manchester Domicile, 955 Goffs Falls Rd., Manchester, NH 03103. The Device is further described in Attachment A.

6. The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

7. As detailed below, this investigation has developed probable cause to believe that Candido ECHEVARRIA and other persons have committed violations of 21 U.S.C. § 841, Distribution of and Possession with Intent to Distribute Controlled Substances.

8. In October 2020, a cooperating defendant (hereinafter CD#1) proffered related to CD#1's criminal case and other criminal activities CD#1 was familiar with. CD#1 had legal representation present for this proffer.

9. During the above-referenced proffer, CD#1 provided information relating to CD#1's knowledge of criminal activity, including CD#1's purchasing of cocaine from a family of Dominican descent from Lynn, Massachusetts. CD#1 referred to these cocaine dealers by name, to include "Joe," "Joel" and "Tito." CD#1 said there were several phone numbers for the dealers saved in CD#1's phone. CD#1 consented to a search of the phone, which when reviewed, confirmed the information CD#1 provided. Because this topic was not the sole reason for the October 2020 proffer, a follow-up proffer was scheduled.

10. In January 2021, Postal Inspectors met CD#1 for a proffer specific to CD#1's dealings with the aforementioned family of Dominican drug traffickers. CD#1 again had legal representation present for this proffer. CD#1 provided in-depth details related to previous cocaine purchases, including locations, prices, quantities, and names of suppliers. CD#1 indicated "Tito" was CD#1's most recent cocaine dealer and had supplied cocaine to CD#1 since 2016 or 2017, and through at least 2018 and possibly into 2019. CD#1 had bought about 30 to 40 ounces of cocaine powder during this timeframe from "Tito," generally two to four ounces at a time. CD#1 indicated "Tito" used the same phone number for all the cocaine purchases. CD#1 was confident "Tito" still had the same phone number and that "Tito" would still willingly sell cocaine to CD#1. In the presence of Inspectors, CD#1 sent a text message to the number which was the number "Tito" used in previous cocaine sales to CD#1. Shortly afterwards, CD#1 received a response that made CD#1 confident it was "Tito." A brief text conversation took place with the last text from "Tito" reading "Ok, if you wanna make business again, just let me know." Based on this text, CD#1 was confident "Tito" would sell CD#1 cocaine in the future.

11. In March 2021, I was working undercover with CD#1. Under my direction, CD#1 made contact with "Tito," who was still using the number. CD#1 sent "Tito" a text

inquiring if "Tito" was available to meet with CD#1 and sell cocaine. CD#1 and "Tito" had a text message conversation that led CD#1 to believe "Tito" would meet CD#1 to sell cocaine at an agreed upon location in New Hampshire.

12. On March 4, 2021, I conducted an undercover operation with CD#1 to purchase cocaine from "Tito." CD#1 was equipped with an electronic recording device. Senior Assistant Attorney General Danielle Sakowski of the New Hampshire Attorney General's Office granted "one-party" authorization for this recording device. At approximately 1:25 p.m., Sgt. Norris of the New Hampshire State Police NIU, Postal Inspector Sean Doyle, and I met with CD#1. Prior to the transaction, I searched CD#1's person and vehicle for drugs, unexplained money, weapons, and other contraband. None were found. CD#1 was provided $2,000 in serialized U.S. currency to buy the cocaine from "Tito." CD#1 showed me a text message from "Tito" sent at approximately 1:20 p.m. that indicated he was 34 minutes away from the agreed upon meeting location. At approximately 1:55 p.m. CD#1 arrived at the agreed-upon meeting location in Seabrook, New Hampshire. At approximately 1:55 p.m., I called CD#1 who advised "Tito" had texted that he was 5 minutes away. At 1:58 p.m., surveillance units observed a 2012 Honda Accord with Massachusetts license plate number arrive and park in close proximity to CD#1's vehicle. Surveillance units observed a Dominican male exit the Honda Accord and enter the right, front passenger door of CD#1's vehicle. Through the electronic monitoring device, I heard CD#1 greet the Dominican male and a brief conversation between the two. I then heard what sounded like the exchange of money and money being counted. I then heard the Dominican male exiting CD#1's vehicle. Surveillance units confirmed the Dominican male exited CD#1's vehicle and returned to the driver's seat of the Honda Accord. CD#1 then left the meeting location. I met with CD#1 who immediately provided me with the drugs purchased from "Tito." CD#1 produced two tied off, clear plastic bags containing a chunky, white substance I recognized through training and experience

to be cocaine. CD#1 also provided me with $500 of serialized U.S. currency and advised "Tito" charged CD#1 $1,500. Inspector Doyle searched CD#1's person and I searched CD#1's vehicle for drugs, unexplained money, weapons and other contraband. None were found.

13. Surveillance units followed "Tito" from Seabrook, New Hampshire to in here he was last observed entering the door.

14. On March 4, 2021, I performed a motor vehicle registration check on the vehicle "Tito" drove and learned the vehicle was registered to Candido ECHEVARRIA, date of birth .

15. On March 4, 2021, I obtained an investigative photograph of ECHEVARRIA provided by Massachusetts. CD#1 was shown this photograph and confirmed the subject was "Tito" and that he had purchased cocaine from him.

16. On March 5, 2021, I transported the drugs CD#1 purchased from ECHEVARRIA to the New Hampshire Forensic Laboratory for analysis.

17. On April 16, 2021, I performed an internet query on ECHEVARRIA using the online database CLEAR, an investigative platform that searches proprietary sources and public records to obtain information on individuals and businesses. CLEAR, which has proven reliable in previous investigations, confirmed ECHEVARRIA has a 2012 Honda Accord with Massachusetts license plate number registered in his name. Further, the address of which ECHEVARRIA returned to after the controlled buy, was connected to him. Lastly, this search confirmed that phone number was affiliated with ECHEVARRIA.

18. On June 4, 2021, I received an analysis report from the New Hampshire Forensic Laboratory. The report confirmed the drugs purchased from ECHEVARRIA on March 4, 2021, which

had a total weight of powder and chunk material of 58.92 grams (2.07 ounces), tested positive for cocaine.

19. On Tuesday, June 29, 2021, at approximately 12:23 p.m., I was working undercover again with CD#1. Under my direction, CD#1 contacted ECHEVARRIA via cellular phone to purchase cocaine. ECHEVARRIA was again utilizing the phone number for this communication. CD#1 and ECHEVARRIA had a conversation via text messaging related to ECHEVARRIA's availability to meet and sell CD#1 four ounces of cocaine. ECHEVARRIA agreed to meet CD#1 in Seabrook, New Hampshire on June 30, 2021 and sent the text "4-2400," suggesting the price of four ounces would be $2,400.

20. On Tuesday, June 29, 2021, I applied for and was granted an arrest warrant by the U.S. District Court for the District of New Hampshire for ECHEVARRIA for Distribution of a Controlled Substance.

21. On Wednesday, June 30, 2021, at approximately 10:30 a.m., I was working undercover with CD#1 to see if ECHEVARRIA still planned on coming to New Hampshire to sell CD#1 four ounces of cocaine.

22. At approximately 8:04 a.m. that same day, surveillance units observed the following vehicle parked on in :

MA Reg:
2012 Honda Accord
Black in Color
Registered to:
Candido Echevarria
DOB

23. At approximately 10:33 a.m., CD#1 received a text from ECHEVARRIA confirming they were still meeting at 12:00 p.m. Surveillance units observed ECHEVARRIA get into the driver's seat of the aforementioned Honda Accord and drive to

and then to . ECHEVARRIA was driving alone and then traveled northbound on I-95 towards New Hampshire.

24. At approximately 11:42 a.m., ECHEVARRIA was stopped in New Hampshire and taken into custody. Inspector Doyle and I responded to the car stop and conducted a search of ECHEVARRIA's car. During this search, I located several items in the trunk addressed to and in ECHEVRRIA's name. I also located a small Taco Bell box that was open on one end and sealed on the other. Inside this box, I located a large, clear, plastic bag that contained a white, chunky substance that based on my training and experience I recognized as cocaine. I also found the Device, a cellular phone (described in Attachment A) in the driver's compartment that appeared to be acting as a GPS aid. I noticed while performing the search that the phone would ring from time to time, showing it was capable of receiving phone calls. Because there were no other working cellular phones in the vehicle or in ECHEVARRIA's possession, I believe this was the phone ECHEVARRIA was using to communicate with CD#1. I seized both the bag containing the white chunky substance and the cellular phone as evidence.

## TECHNICAL TERMS

25. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and

from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or

miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media

include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers/wireless telephones on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer, wireless telephone attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer/wireless telephone may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

26. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at

http://www.samsung.com/s21, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. The Device also has the ability to access the Internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

27. Based on my knowledge, training, and experience, I know that electronic devices to include wireless telephones can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

28. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

29. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

30. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve

the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

**CONCLUSION**

31. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the wireless/cellular phone described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

/s/ Sean P. Sweeney
Sean P. Sweeney
Trooper First Class NH State Police
Task Force Officer, United States Postal Inspection Service

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and complaint.

Date: 8/30/2021

Time: 2:54 p.m.

/s/ Daniel J. Lynch
Honorable Daniel J. Lynch
U.S. Magistrate Judge

**ATTACHMENT A**

The property to be searched is a black Samsung Galaxy Note 10+ 5G wireless/cellular phone with serial number SM-N976U. The Device is currently located at the United States Postal Inspection Service Manchester Domicile, 955 Goffs Falls Rd., Manchester, NH 03103.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

1. All records on the Device described in Attachment A that relate to violations of 21 U.S.C. § 841 (Distribution and Possession with Intent to Distribute Controlled Substances) and involve Candido ECHEVARRIA since October 2020, including:

a. lists of customers and related identifying information;

b. communications with drug suppliers, drug customers, and accomplices and co-conspirators;

c. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

d. any information related to sources of drugs (including names, addresses, phone numbers, currency used, means of communication or any other identifying information);

e. any information recording Candido ECHEVARRIA's schedule or travel from October 2020, to the present;

f. photographs and videos relevant to drug trafficking, the purchase, possession, or sale of drugs, or the receipt or expenditure of drug proceeds; and

g. all bank records, checks, credit card bills, account information, and other financial records, including records of receipts and expenditures of drug proceeds.

2. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3. Records evidencing the use of the Internet and Internet Protocol addresses including:

a. records of the Internet Protocol addresses used;

b. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.